[Civ. Nos. 16778, 16779. First Dist., Div. One. Aug. 28, 1956.]

DEWEY DESHOTEL, JR., Respondent, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation) et al., Appellants.

[Two Cases.]

Robert W. Walker, William F. Brooks, William J. Hayes, Hardin, Fletcher, Cook & Hayes, Cyril Viadro, Ricksen, Freeman & Johnson and Lewis P. May for Appellants.

James A. Myers and D. W. Brobst for Respondent.

BRAY, J.—The jury rendered a verdict in favor of plaintiff against all defendants for $365,000.[1] On defendants' motion for new trial, the trial court, as a condition for denial thereof, reduced the amount to $290,000. Plaintiff accepted this re-

[1]This was the second trial of the case. On the first trial the jury verdict was for $300,000 against Yellow Cab and Hughes (its driver) alone. The trial court granted a new trial as to all issues against the Santa Fe and Floyd (its engineer) on the ground of insufficiency of evidence and errors of law and against Yellow Cab and Hughes on the ground of excessive damages. On appeal the order granting new trial was affirmed. (*Deshotel* v. *Atchison, T. & S. F. Ry. Co.*, 126 Cal.App.2d 303 [272 P.2d 71].)

duction. All defendants appeal from the judgment entered thereon.[2]

## QUESTIONS PRESENTED

1. Santa Fe appeal: (a) Admission of photographs of other crossings. (b) Admission of number of accidents at these other crossings. (c) Excessive damages.

2. Yellow Cab appeal: Was the negligence of the Santa Fe the sole proximate cause of the accident?

1. *Santa Fe Appeal.* (a) Photographs.

While the Santa Fe contended at the trial that the negligence of the cab driver was the sole proximate cause of the accident, it concedes that the evidence supports the verdict as to liability. It contends, however, the case on this issue was very close and hence any error would have been prejudicial.

On the rainy morning of January 11, 1952, a Santa Fe train, driven by William Floyd, was proceeding northwesterly through the Berkeley residential area toward an eastern destination. The Santa Fe right of way, in this vicinity, runs northwesterly and southeasterly, crossing east-west streets at an angle a little less than perpendicular. At the intersection of Parker Street, which runs east and west, and Acton Street, which runs north and south, the Santa Fe right of way crosses the intersection slightly to the east of its center, and at an acute angle to Acton Street. As the train approached the Parker-Acton intersection, the Yellow Cab, of which Archie Hughes was the driver, and plaintiff Deshotel was the passenger, was going east on Parker Street, approaching the intersection. At about 9:30 a. m. the cab and the train collided at the intersection, resulting in serious injuries to Deshotel. There was evidence that the train did not ring a bell or sound a whistle as it approached the crossing, and that it was proceeding at a speed in excess of the maximum speed permitted by the Santa Fe rules.[3] The crossing was protected by an advance warning sign, by cross-arms and by a white sign painted on the pavement, but no wigwag. Defendant Yellow Cab, in an attempt to show that Santa Fe did not use ordinary care to protect the Parker Street crossing and maintained a trap there, introduced in evidence (over Santa Fe's objection) photographs of eight crossings adjacent to Parker

[2]Separate appeals were filed by Santa Fe and Floyd, jointly, and by Yellow Cab and Hughes, jointly. These appeals have been consolidated.

[3]A circumstance proper to be considered by the jury in determining whether the railroad was negligent. (*Gett* v. *Pacific Gas & Elec. Co.*, 192 Cal. 621 [221 P. 376].)

Street (five to the south, three to the north), as well as of the Parker Street crossing.[4] Seven of the eight other crossings were each protected by a wigwag.

Defendants contend that the admission of the photographs of the other crossings was error because there was no showing of similarity with the Parker Street crossing, particularly as to visibility of the railroad from the intersecting streets. The accident occurred at the crossing in the intersection of Acton Street and Parker. The other eight crossings were not at street intersections but in the middle of the block. From the aerial photographs of the area (including the eight other crossings) admitted without objection, this appears to be the main difference from the Parker Street crossing. The Berkeley Director of Planning who was the only one who testified on the subject testified that the neighborhood of the nine crossings was of the same general character, that is, about the same size houses, kind of landscape treatment, character of streets, trees, etc., but that the crossings were different as to closeness of the houses to the tracks. He could not say concerning the blocking or not blocking of view or visibility at the various crossings. He did say that "in terms of sight distance" the crossing areas were different. ▉ Counsel stipulated that the trial judge could go to the scene and make a preliminary determination as to the similarity of the crossings. This the trial judge did and reported that the crossings were "essentially similar." As said in *Jensen* v. *Southern Pac. Co.*, 129 Cal.App.2d 67, 74 [276 P.2d 703] : "Identical conditions will rarely be found. Substantial similarity is normally sufficient. Determination of relevancy, including similarity of conditions in such a case, is primarily the function of the trial judge." Defendants have pointed out no difference in visibility between the crossings other than the fact that at the Parker Street crossing Acton Street had to be crossed by the taxi to meet the right of way, whereas the other crossings involved only one street and the right of way. Looking at all nine photographs and the aerial photograph, the visibility at all crossings seems to be substantially the same. Moreover, the court instructed the jury that it would have to find the crossings substantially similar before it could consider the fact of wigwags at the other crossings and not at Parker Street as a factor in determining whether the Santa Fe maintained the degree of care required of it. This

---

[4] The jury viewed this crossing.

instruction was more favorable to defendants than they were entitled to as determination of similarity "is primarily the function of the trial judge." (*Jensen* v. *Southern Pac. Co., supra,* 129 Cal.App.2d at p. 74.)

Defendants contend that the taxi driver, Hughes, was familiar with the Parker Street crossing and hence it is doubtful if the Santa Fe owed him as much warning as it owed others who were not familiar with the crossing. Hughes denied having gone over the crossing before although admitting that he had crossed the same tracks in other places many times, including approaching the tracks nearby twice that day. These matters merely went to the weight of the evidence, not to the admissibility of the photographs. We see no error in the admission of the photographs.

(b) Number of Accidents.

Over objection and on cross examination by Yellow Cab, Gibson, an engineer of the Public Utilities Commission, testified as to the number of accidents occurring at the other crossings over the preceding 25 years, approximately. First contending that such evidence was inadmissible because of dissimilarity of *conditions* at Parker Street to those at the other crossings (this contention we have already discussed above) defendants contend that the evidence was inadmissible because there was no similarity shown between those *accidents* and the one here. The evidence in question was adduced under the following circumstances: Gibson was called by the Santa Fe in rebuttal to testify to a survey of the Santa Fe crossings made in 1948 by the Public Utilities Commission for the purpose of making recommendations for safety precautions at railroad crossings. He testified that the commission had made various recommendations concerning wigwags at the other eight crossings but had not recommended one at the Parker Street crossing; that the history of accidents at all the crossings was considered in making the recommendations. Santa Fe counsel asked him the number of accidents at the Parker Street crossing since 1927. There were five. Then counsel for Yellow Cab asked if the records showed the number of accidents during the same period at the other crossings, where there were wigwags. Santa Fe objected "unless there is a foundation laid." The court overruled the objection, stating that the foundation had been laid by the testimony that the accident history had been considered by the commission in determining whether or not wigwags should be in-

stalled. The testimony showed either no accidents or less accidents at the wigwag crossings than at the Parker Street crossing. Santa Fe contends that Gibson's testimony was to show that the standards at the various crossings were Public Utilities Commission and not Santa Fe standards, and that the number of accidents was immaterial. ▮ If this were true, there was no reason for Santa Fe to bring out the number of accidents at Parker Street. By so doing it opened the door for a showing of the number at the other crossings.

Santa Fe contends that it was forced to ask Gibson concerning the number of accidents at Parker Street, because prior thereto Yellow Cab had asked him if there had not been five accidents there. The court had then overruled Santa Fe's objection to the question. However, the witness stated that he did not make the surveys and the question was not answered. Thus, when Santa Fe took the witness on redirect there was no evidence before the jury of any accidents at the crossing and the Santa Fe was not forced to interrogate him on the subject. Moreover, to bring out information on the subject the Santa Fe required Gibson to testify from the commission reports.

(c) Excessive Damages.[5]

Santa Fe refers to plaintiff's injuries as "tragic." There was no dispute as to his injuries or their serious effect. ▮ Without detailing them it is sufficient to state that he will never be able to earn money or to take care of himself. He will continue to have to have assistance to be turned in bed, and to be placed on a toilet seat or in a wheel chair. He will be unable to use the left side of his body or either leg. He will continue to be incontinent of urine. He has a large skull defect. He will require medical attention from time to time and a nurse daily. The jury verdict was for $365,000, which the trial judge reduced to $290,000. The parties assume that this figure is comprised of the following amounts: Medical expenses to time of trial, $20,020.69; lost wages (he was making $400 per month as a barber at the time of injury), $12,800; total, $32,820.69. Plaintiff's life expectancy is 32.77 years. $300 per month was allowed for his future care, allowing for only one nurse at eight hours per day. The present cash value of $300 per month for his life

---

[5]Only Santa Fe and Floyd made this claim. Yellow Cab and Hughes, in their opening brief, state that although they intended to raise this issue, they now believe that the decision in *Leming* v. *Oilfields Trucking Co.*, 44 Cal.2d 343 [282 P.2d 23], "has rendered this issue moot."

expectancy at 2 per cent per month, is $86,712. Present cash value of future earnings for that period, $400 per month at 2 per cent, $115,616. These amounts total $235,148.69, leaving $54,851.31 for general damages. Santa Fe's quarrel is principally with the basis of 2 per cent interest, contending that 5 per cent would be more realistic. The jury and the court were given figures based upon returns of 2, 3, 4, and 5 per cent respectively. Apparently annuity policies are figured on a 2 per cent basis. The jury and the court had before them these various bases. There was no testimony that the 2 per cent basis is unrealistic. Before them also was evidence of plaintiff's physical condition, from which he can never recover. Undoubtedly the jury considered the possibility that he may not live out his life expectancy, and that if he outlives his expectancy he may not have had to touch his capital and may have accumulated some of the interest besides. In view of his helpless condition, the additional medical expense he is sure to have, and perhaps the necessity of more than one nurse per day, the probability of advancement of his earning ability had he not been injured, the ever rising cost of living, the fact that he will have to pay taxes on interest or any return on invested moneys, and all the other circumstances of the case, we cannot say that the reduced amount of the verdict is so excessive as to be the result of passion and prejudice. " 'The verdict is undoubtedly high. Nevertheless, it is not the function of a reviewing court to interfere with a jury's award of damages unless it is so grossly disproportionate to any reasonable limit of compensation warranted by the facts that it shocks the court's sense of justice and raises a presumption that it was the result of passion and prejudice. [Citation.] The amount of the verdict must be viewed in the light of the evidence before the trial court. [Citation.] The trial court, in denying a motion for new trial, found that the verdict was not excessive. . . .' " (*Leming* v. *Oilfields Trucking Co., supra,* 44 Cal.2d 343, 358-359 [282 P.2d 23], quoting from *Johnston* v. *Long,* 30 Cal.2d 54, 76 [181 P.2d 645].) Here the trial court, while finding the verdict to be excessive, found, in effect, that $290,000 was not excessive. Considerable weight, also, must be given by us to the fact that the trial court weighed all the facts of the case in arriving at the reduced amount. While it is very difficult to compare awards in various cases, due to difference in type of injuries, requirements of medical and other care, difference in the value of the dollar at particular times, etc., it is significant to note that in the Leming case,

*supra*, the Supreme Court refused to hold excessive an award of $213,460.22 to a plaintiff who was 47 years of age with an expectancy of 23.08 years (our plaintiff was 29 years with an expectancy of 32.77 years) with injuries no worse than those received by plaintiff. There, too, the award for general damages covering suffering, pain, physical discomfort, mental worry, past and future, was $38,201.60. In our case such award was $54,851.31. While it is true that plaintiff has the privilege of remaining at a veteran's hospital whose charges are but little over $6,000 per year, defendants cannot contend that he must remain there for the balance of his life. He has the right, if he so desires, to live in his own home, obtaining there the necessary care and attention which would cost at least the amount allowed therefor.

## 2. *Yellow Cab Appeal.*

It contends that the evidence establishes as a matter of law, that the Santa Fe negligence created a trap for the cab and was the sole proximate cause of the accident. There is evidence that two cars preceded the cab across the crossing and narrowly missed being hit by the train. However, there is evidence that the cab did not stop at any time before proceeding upon the railroad tracks, that it was going at an excessive rate of speed, and that the driver failed to see what was obvious, namely, the approaching train. ■ Assuming, but not deciding, that a trap was caused by excessive speed of the train, lack of warning by bell or whistle, lack of a wigwag, by cross-arm signals partially obscured by trees, by writing on the street obscured by water thereon, and tracks flush with the street giving poor, if any, warning of their presence, the evidence amply shows that the cab driver did not exercise the utmost caution characteristic of a very careful and prudent man, which was the duty of the cab driver. (See *Bezera* v. *Associated Oil Co.*, 117 Cal.App. 139, 143 [3 P.2d 622].) ■ "If an injury is produced by the concurrent effect of two separate wrongful acts, each is a proximate cause of the injury, and neither can operate as an efficient intervening cause with regard to the other. [Citations.] The fact that neither party could reasonably anticipate the occurrence of the other concurrent cause will not shield him from liability so long as his own negligence was one of the causes of the injury. [Citations.]" (*Taylor* v. *Oakland Scavenger Co.*, 17 Cal.2d 594, 602 [110 P.2d 1044].) ■ It is clear that there

was evidence sufficient to support the jury's finding that Yellow Cab's negligence was a proximate and concurring cause of plaintiff's injuries.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied September 27, 1956, and appellants' petitions for a hearing by the Supreme Court were denied October 24, 1956.